# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

OBSIDIAN FINANCE GROUP, LLC, )
an Oregon limited liability company, as )
Securityholder Representative, )
                                 )
              Plaintiff, )
                                 )
              v. )            **C.A. No. 2020-0485-JRS**
                                 )
IDENTITY THEFT GUARD )
SOLUTIONS, INC., d/b/a ID EXPERTS, )
a Delaware Corporation, as successor by )
merger to Identity Theft Guard Solutions, )
Inc., and ID Experts Merger Sub, Inc., and )
ID EXPERTS HOLDINGS, INC., a )
Delaware Corporation, )
                                 )
              Defendants. )

## MEMORANDUM OPINION

Date Submitted: February 15, 2021
Date Decided: April 22, 2021

Richard M. Beck, Esquire and Craig E. Rushmore, Esquire of Klehr Harrison Harvey Branzburg LLP, Wilmington, Delaware, Attorneys for Plaintiff Obsidian Finance Group, LLC.

Brad D. Sorrels, Esquire, Jessica A. Hartwell, Esquire and Nora M. Crawford, Esquire of Wilson Sonsini Goodrich & Rosati, PC, Wilmington, Delaware, Attorneys for Defendants Identity Theft Guard Solutions, Inc., d/b/a ID Experts and ID Experts Holdings, Inc.

**SLIGHTS, Vice Chancellor**

In Delaware, a plaintiff asserting a claim for breach of contract must come to terms, quite literally, with the contract itself before his claim may proceed. As a contractarian state, Delaware courts generally will enforce the parties' bargained-for agreement as written. When the contract is clear, it is natural for a defendant confronting a breach claim to call the question of whether the contract supports the plaintiff's claim at the earliest opportunity through a motion to dismiss the complaint. In that event, our trial courts will construe the contract as a matter of law. If it is clear and unambiguous, and does not support the claim of breach, the complaint asserting that claim will be dismissed. That is what must happen here.

Plaintiff, Obsidian Finance Group, LLC ("Obsidian" or "Plaintiff"), asserts claims against Defendants, Identity Theft Guard Solutions, Inc., d/b/a ID Experts ("ID Experts" or the "Company") and ID Experts Holdings, Inc. ("Holdings" and, together with ID Experts, "Defendants"), following its acquisition of ID Experts in 2016. Section 1.11(a) of the parties' Agreement and Plan of Merger (the "Merger Agreement") unambiguously contemplates a contingent payment to former securityholders (including Obsidian) only upon "an extension or renewal of the OPM Contract for an additional term of at least six (6) years (or a new or replacement contract for a term of at least six (6) years) . . . " (the "OPM Earnout").[1]

---

[1] Pl.'s Verified Am. Compl. (D.I. 13) ("Compl.") Ex. A ("Merger Agreement") § 1.11.

1

Obsidian acknowledges that the "OPM Contract"—a term defined in the Merger Agreement as an identified contract awarded by the United States ("U.S.") Naval Sea Systems Command to the Company—terminated after five years and six months. It follows syllogistically that the OPM Earnout was not triggered, and Defendants informed Obsidian post-closing that the OPM Earnout would not be paid.

Undeterred by Section 1.11(a)'s plain text, Obsidian filed its Verified Amended Complaint (the "Complaint") asserting counts for breach of contract and, in the alternative, declaratory judgment or reformation. The crux of their claim is that, unbeknownst to either party at closing, Federal Acquisition Regulations ("FAR") in place at the time of contracting made satisfaction of the OPM Earnout condition impossible.

Defendants move to dismiss Obsidian's Complaint, arguing the plain language of the contract controls and, in any event, the applicable FAR allowed for the OPM Contract to be extended to six years as contemplated by the OPM Earnout. For reasons explained below, I agree with Defendants and grant their motion in full.

# I. BACKGROUND

I draw the facts from the Complaint and documents incorporated therein by reference or integral to the pleading.[2] Any additional facts are either not subject to reasonable dispute or are subject to judicial notice.[3]

## A. The Parties

Plaintiff, Obsidian, is an Oregon limited liability company located in Lake Oswego, Oregon.[4] The Merger Agreement appointed Obsidian as the Securityholder Representative and, in that capacity, Obsidian is specifically authorized to enforce any and all rights of the former Company securityholders (the "Company Securityholders") under the Merger Agreement, including with respect to the OPM Earnout.[5]

---

[2] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[3] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[4] Compl. ¶ 6.

[5] *Id.*; *see also* Merger Agreement §§ 7.1, 8.7.

Defendant, ID Experts, is a Delaware corporation with its headquarters in Portland, Oregon.[6] It is the surviving corporation of the Merger, which closed on August 2, 2016.[7]

Defendant, Holdings, is a Delaware corporation with its headquarters in Portland, Oregon.[8] Holdings is the sole owner of ID Experts.[9]

## B. The Company Earns a Government Contract

In 2015, the U.S. Office of Personnel Management ("OPM") publicly announced that two separate but related cybersecurity incidents had impacted the data of federal government employees, contractors and others.[10] On September 1, 2015, ID Experts was awarded the OPM Contract, a contract awarded by the U.S. Naval Sea Systems Command on behalf of the U.S. government to provide data breach response services for a three-year term.[11] The OPM Contract included a total

---

[6] Compl. ¶ 7.

[7] *Id.*

[8] Compl. ¶ 8.

[9] *Id.*

[10] *Cybersecurity Resource Center: Cybersecurity Incidents*, UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, https://www.opm.gov/cybersecurity/cybersecurity-incidents/ (last visited April 21, 2021).

[11] Compl. ¶ 13; *see also* Compl. Ex. B ("OPM Contract").

4

award amount of $133,263,550.[12] Its term was three years upon execution, with an opportunity for an extension as specified in the contract.[13]

In 2017, Congress required under the Consolidated Appropriations Act that the U.S. government provide data breach services to persons potentially affected by the data breaches for a period of at least ten years.[14] Accordingly, the congressionally mandated data breach coverage will run through the U.S. government's 2026 fiscal year, which ends on September 30, 2026.[15] Needless to say, this was a promising development for ID Experts generally and the prospect for an extension of the OPM Contract specifically.

## C. The Merger Agreement and the OPM Earnout

In early 2016, the Company began its search for potential acquirors for its "ID Experts Business," which included the Company's data breach response services as provided under the OPM Contract.[16] Indeed, the Company touted the OPM Contract and incorporated that opportunity and the prospect of an extension

---

[12] Compl. ¶ 12.

[13] Compl. ¶ 13.

[14] Compl. ¶ 15.

[15] *Id.*

[16] Compl. ¶ 16.

into its valuation.[17] Non-party, Peloton Equity, LLC ("Peloton"), was the principal sponsor of, and lead investor in, a consortium that agreed to purchase the ID Experts Business.[18]

On August 2, 2016, the Merger parties executed the Merger Agreement, which comprised two transactions that (1) spun-off the Company's "Radar Business" to a newly created subsidiary of the Company, which was at that time 100% owned by the then-existing Company Securityholders, and (2) transferred the ID Experts business, which included the Company's data breach response services and the OPM Contract, to the Company as the surviving corporation in accordance with the terms of the Merger Agreement.[19] The Merger closed the same day.[20]

To price the contingent nature of the OPM Contract's extension, the parties agreed to the OPM Earnout, as memorialized in Section 1.11(a) of the Merger Agreement, which reads in relevant part:[21]

---

[17] Compl. ¶ 15.

[18] *Id.*

[19] Compl. ¶ 16; *see generally* Merger Agreement.

[20] Compl. ¶ 17.

[21] Compl. ¶ 20.

6

*(a) OPM Earnout Amount.*

(i) If after the Closing the Company enters into **an extension or renewal of the OPM Contract for an additional term of at least six (6) years (or a new or replacement contract for a term of at least six (6) years)**, Parent [Holdings] shall promptly notify Securityholder Representative and on or before the date which is 90 days following the OPM Extension Effective Date, Parent shall pay or cause to be paid to the Company Securityholders (other than in respect of the Rollover Shares, Rollover Options or Dissenting Shares and subject to the payment of the OPM Earnout Escrow Amount as set forth herein) in cash an aggregate amount equal to fifty percent (50%) of the OPM Earnout Amount, with each such Company Securityholder entitled to receive its Pro Rata Earnout Percentage of such fifty percent (50%) portion of the OPM Earnout Amount, subject to Section 1.11(a)(iv).[22]

By Section 1.11(a)(i)'s terms, 50% of the OPM Earnout Amount was conditioned on the Company's renewal or extension of the existing OPM Contract for an additional term of six years. The OPM Earnout Amount is defined in the Merger Agreement to equal $7,158,684—just over 10% of the total consideration.[23]

Section 1.11(a)(ii) then provides:

(ii) **If as of the eighteen (18) month anniversary of the OPM Extension Effective Date, the OPM Contract (as extended), or a new or replacement contract in accordance with Section 1.11(a)(i), remains in full force and effect**, then Parent shall pay or cause to be paid to the Company Securityholders (other than in respect of the Rollover Shares, Rollover Options or Dissenting Shares) in cash an aggregate amount equal to the Applicable Deferred OPM Earnout Payment Amount, with each such Company Securityholder entitled to

---

[22] Merger Agreement § 1.11(a)(i) (emphasis added); Compl. ¶ 20.

[23] Merger Agreement § 1.11(a); Compl. ¶ 21.

7

receive its Pro Rata Earnout Percentage of such Applicable Deferred OPM Earnout Payment Amount, subject to Section 1.11(a)(iv).[24]

The "Applicable Deferred OPM Earnout Payment Amount" is defined as "the lesser of (i) fifty percent (50%) of the OPM Earnout Amount, or (ii) the OPM Contract Operating Profit," which is defined as operating profits from the renewed or replacement contract.[25]

Beyond these provisions, the Merger Agreement and its ancillary agreements contained customary disclaimers. Most relevant here, Section 8.9 contained an integration clause,[26] and Section 5.12 contained broad anti-reliance language which, among other things, stipulated that the Company Securityholders had been given sufficient time to seek independent legal advice as they deemed appropriate.[27]

---

[24] Merger Agreement § 1.11(a)(ii) (emphasis added).

[25] *Id.* § 1.11(a)(iii)(A).

[26] *Id.* § 8.9 ("This Agreement, including the Company Disclosure Schedule and the other exhibits, documents and instruments referred to herein or therein constitute the entire agreement, and supersede all other prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof, which shall be completely superseded by this Agreement.").

[27] *Id.* § 5.12 ("SECURITYHOLDER ACKNOWLEDGES THAT . . . SECURITYHOLDER HAS BEEN GIVEN SUFFICIENT TIME TO CONSIDER THIS AGREEMENT AND TO SEEK INDEPENDENT LEGAL OR OTHER ADVICE AS IT DEEMS APPROPRIATE. SECURITYHOLDER ACKNOWLEDGES THAT SECURITYHOLDER HAS FULLY READ, KNOWS AND UNDERSTANDS THIS AGREEMENT AND IS EXECUTING THIS AGREEMENT VOLUNTARILY OF SECURITYHOLDER'S OWN FREE WILL. SECURITYHOLDER ACKNOWLEDGES THAT SECURITYHOLDER HAS NOT RELIED UPON ANY INDUCEMENTS, PROMISES, OR REPRESENTATIONS MADE BY ANYONE EXCEPT AS EXPRESSLY SET FORTH HEREIN OR IN THE MERGER AGREEMENT.

Importantly, the parties did not bargain for a "reasonable efforts" or similar condition related to the Company's achievement of the OPM Earnout.[28]

### D. ID Experts Enters into the Second OPM Contract

On December 21, 2018, the Company entered into a second agreement with the U.S. government to provide the OPM Contract Services (the "Second OPM Contract").[29] While the parties agree the Second OPM Contract constituted a renewal or extension as contemplated under Section 1.11 of the Merger Agreement, it did not extend the contract by the six years required to trigger the OPM Earnout.[30] Rather, the Second OPM Contract provides for services to be rendered for 4.5 years as a base and option period, with a one-year transition period.[31] Obsidian does not allege the Company had any control over (or input into) the duration of the Second OPM Contract as set by the U.S. government.

---

SECURITYHOLDER IS ENTERING INTO THIS AGREEMENT WITHOUT ANY THREATS, COERCION OR DURESS, WHETHER ECONOMIC OR OTHERWISE, HAVING BEEN MADE TO SECURITYHOLDER, AND SECURITYHOLDER INTENDS TO BE BOUND BY THE TERMS OF THIS AGREEMENT.") (all caps in original).

[28] *See* Lou R. Kling, Eileen T. Nugent & Brandon A. Van Dyke, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions*, § 13.06, at 13-44 (2020 Ed.) (describing "reasonable best efforts" clauses and explaining that the clauses describe how hard a party must work to achieve a desired result).

[29] Compl. ¶ 29; *see also* Compl. Ex. D ("Second OPM Contract").

[30] *See* Second OPM Contract at 2.

[31] *Id.*

On January 8, 2019, the Company's CEO, non-party Tom Kelly, notified Obsidian by email that the Company was awarded the Second OPM Contract.[32] In that email, Kelly noted, "[t]he term [of the Second OPM Contract] does not meet the threshold of 'at least six (6) years' provided in Section 1.11(a)(i) of the Merger Agreement, and accordingly, the OPM Earnout Amount as defined in Section 1.1(a) is not payable to the Company Securityholders."[33]

Kelly's email prompted Obsidian's investigation into why the OPM Earnout was not achieved.[34] Obsidian ultimately determined that, unbeknownst to the parties at signing of the Merger Agreement, federal regulations precluded the Second OPM Contract's extension to six years.[35] Obsidian's conclusion was based on FAR 17.204(e), which provides:

> (e). **Unless otherwise approved in accordance with agency procedures, the total of the basic and option periods shall not exceed 5 years in the case of services, and the total of the basic and option quantities shall not exceed the requirement for 5 years in the case of supplies.** These limitations do not apply to information technology contracts. However, statutes applicable to various classes of contracts, for example, the Service Contract Labor Standards statute

---

[32] Compl. ¶ 27; Compl. Ex. C.

[33] Compl. Ex. C.

[34] Compl. ¶¶ 27–28.

[35] Compl. ¶ 31.

10

(see 22.1002-1), may place additional restrictions on the length of contracts.[36]

According to Obsidian, the OPM contracts were both contracts for "services"(but not "information technology contracts") which, by FAR 17.204's terms, could not have exceeded six years as measured by the OPM Earnout.

### E. Procedural History

On September 11, 2020, Plaintiff filed its operative Amended Verified Complaint, which contains three counts.[37] Count I asserts a breach of contract claim for Defendants' failure to pay the OPM Earnout.[38] Count II seeks, in the alternative to Count I, a declaratory judgment that the OPM Earnout was not extinguished by the Second OPM Contract.[39] Count III seeks, in the alternative to Counts I and II, reformation of Section 1.11(a)(i) because the requirement of a single extension or a new contract for a term of six years to trigger the OPM Earnout is the product of a mutual mistake of fact and law by the Merger parties and, therefore, does not reflect

---

[36] FAR 17.204(e) (emphasis added).

[37] D.I. 13.

[38] Compl. ¶¶ 46–53.

[39] Compl. ¶¶ 54–61.

11

the true intent of the parties with respect to the conditions required for payment of the OPM Earnout Amount.[40]

On September 25, 2020, Defendants filed their motion to dismiss all counts of the Complaint.[41] The Court heard argument on the motion on February 15, 2020, and it was deemed submitted for decision that day.[42]

## II. ANALYSIS

When considering a motion to dismiss under Chancery Rule 12(b)(6), the Court must:

> (1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) [not dismiss the claims] unless plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[43]

---

[40] Compl. ¶¶ 62–72.

[41] D.I. 14.

[42] D.I. 26.

[43] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (internal citation omitted). Plaintiff contends, at the threshold, that the Court must accept as true its allegations as to the operation of the FAR and the existence of government agency procedures. Pl.'s Answering Br. at 13–14. Not so. While the Court must accept factual allegations as true at the pleading stage, it cannot assume as true a plaintiff's legal conclusions. *See, e.g.*, *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 665–65 (Del. Ch. 2013) (rejecting plaintiff's alleged legal conclusions).

Dismissal is warranted only where a plaintiff fails to plead facts supporting an element of their claim, or if "it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiff[] would not be entitled to relief."[44] In opposing Defendants' dismissal motions, Plaintiff is owed every favorable factual inference so long as it is reasonable.[45]

## A. Plaintiff Fails to State a Viable Claim in Count I

In Count I, Obsidian alleges that Defendants' failure to pay the OPM Earnout breached the Merger Agreement. "In order to allege a breach of contract, a plaintiff must show the existence of a contract, a breach of the contractual obligations, and damages to the plaintiff as a result of the breach."[46] "Delaware courts follow the objective theory of contracts, giving words their plain meaning unless it appears that the parties intended a special meaning."[47] In other words, "[u]nder Delaware law, which is more contractarian than that of many other states, parties' contractual choices are respected . . . ."[48]

---

[44] *McMullin v. Beran*, 765 A.2d 910, 916 (Del. 2000) (internal quotations omitted).

[45] *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *7 n.36, 38 (Del. Ch. July 24, 2009).

[46] *Sparton Corp. v. O'Neil*, 2017 WL 3421076, at *5 (Del. Ch. Aug. 9, 2017).

[47] *Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at *15 (Del. Ch. Feb. 27, 2020) (internal quotations and citations omitted).

[48] *GRT Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *12 (Del. Ch. July 11, 2011).

13

Obsidian does not contest that the Second OPM Contract's 5.5 year term falls short of Section 1.11(a)(1)'s unambiguous requirement that the OPM Earnout Amount be paid only where an extended or replacement contract endured for a period of six years.[49] Nor does Obsidian argue Defendants' failure to secure a six-year contract is a product of bad faith or failure to exercise commercially reasonable efforts. Rather, Obsidian's position appears to be that Defendants somehow breached the Merger Agreement because, under FAR 17.204(e), the Second OPM Contract never could have been extended to a six-year term. While Obsidian does not clearly articulate a legal basis by which the Court could sustain a breach of contract claim that plainly does not rest on the language of the contract, it appears Obsidian would have the Court invoke either of two related but distinct legal theories: impracticability and forfeiture. I analyze each in turn.

1. **No Impracticability**

Obsidian alleges the term limitations on contracts imposed under FAR 17.204 and FAR 52.217–8 made performance under Section 1.11(a)(i) of the Merger Agreement impossible at signing.[50] "These allegations," Obsidian claims, "are sufficient to state a breach of contract claim due to the impracticability of the

---

[49] Compl. ¶ 45.

[50] Pl.'s Answering Br. at 19 (citing Compl. ¶ 49).

stated condition and the forfeiture of the OPM Earnout by the Company Securityholders due to the same impracticability."[51]

Under Delaware law, "impracticability/impossibility [is a] *defense*" implicated where a defendant demonstrates "(1) the occurrence of an event, the nonoccurrence of which was a basic assumption of the contract; (2) the continued performance is not commercially practicable; and (3) the party claiming impracticability did not expressly or impliedly agree to performance in spite of impracticability that would otherwise justify nonperformance."[52] "There can be no invocation of the impossibility [or impracticability] defense if 'the supervening events were reasonably foreseeable, and could and should have been anticipated by the parties and provision made therefor within the four corners of the agreement.'"[53] In other words, neither the doctrine of impossibility nor impracticability "excuse nonperformance where the promisor has indicated an intent to assume the risk."[54]

---

[51] *Id.*

[52] *Bobcat North Am., LLC v. Inland Waste Hldgs., LLC*, 2019 WL 1877400, at *9 (Del. Super. Apr. 26, 2019) (emphasis supplied) (internal quotations omitted).

[53] *Id.* (quoting *Williams Nat. Gas Co. v. Amoco Prod. Co.*, 1991 WL 58387, at *13 (Del. Ch. Apr. 16, 1991)); *see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 2005 WL 5757653, at *6 n.35 (Del. Ch. July 27, 2005) ("[T]he doctrine of 'commercial impracticability' as an extension of the contract defense of impossibility of performance . . . is not to be applied liberally . . . ." (internal quotations omitted).

[54] *In re Bicoastal Corp.*, 600 A.2d 343, 351 (Del. 1991); 17A AM. JUR. 2D *Contracts* § 647 (2021).

15

Obsidian cites no cases where a Delaware court has endorsed the invocation of the contractual *defense* of impracticability as a means *offensively* to trigger a payment obligation. Instead, it relies on the Restatement (Second) of Contracts § 264 (1981) ("Section 264") for the proposition that "if the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made."[55]

The citation to Section 264 is inapt for two reasons. First, nothing in Section 264 suggests it is meant to codify a cause of action for breach of contract where none exists within the four corners of the agreement.[56] Second, Comment A to Section 264 clarifies that "[i]f the prohibition or prevention already exists at the time of the making of the contract, the rule stated in § 266(1) . . . controls."[57]

---

[55] Pl.'s Answering Br. at 20–21 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 264 (1981)).

[56] *See* C.T. Foster, *Modern Status of the Rules Regarding Impossibility of Performance as Defense in Action for Breach of Contract*, 84 A.L.R.2d 12, § 3[a] (1962) (citing Section 264 in its discussion of impossibility or impracticability as a *defense* to a breach of contract claim).

[57] RESTATEMENT (SECOND) OF CONTRACTS § 264 Cmt. a. I note that Section 264 was recently interpreted by this court in *AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC*, in a manner that is useful here. 2020 WL 7024929, at *80 (Del. Ch. Nov. 30, 2020). In *AB Stable*, Vice Chancellor Laster explained that, while the concept of impracticability could prevent a buyer from seeking relief for breach if governmental restrictions arising from COVID-19 prevented a seller from complying with its contractual obligations to operate in the ordinary course, the seller could *not* rely on government restrictions to force the buyer to close if the condition to operate in the ordinary course was not met. *Id.*

Section 266(1), in turn, states that a party's performance is only excused under the doctrine of impracticability if the cause is "a fact of which he has no reason to know . . . ."[58] Comment A to Section 266(1) explains that, "under the rules stated in this Section, the affected party must have had *no reason* to know at the time the contract was made of the facts on which he later relies."[59]

Obsidian's claim clearly does not fit within the rubric of Section 266, as it had every "reason to know" the applicable regulations that it now claims governed the OPM Contract. FAR 17.204(e) was on the books at the time of contract.[60] And Obsidian has no legitimate excuse for its newfound surprise that FAR 17.204(e) existed, particularly where the regulation governs a contract that is the subject of an earnout Obsidian now claims to be at the heart of the parties' bargain. The Merger Agreement was negotiated by two sophisticated commercial parties and Obsidian, not Defendants, was an operator immersed in the realm of government contracts

---

In other words, the seller assumed the risk of the condition's non-occurrence, and the failure of that condition relieved the buyer of its obligation to close. That outcome makes perfect sense; the concept of impracticability does not apply under Section 264 where, as here, "[n]o one is [being] required to comply with an illegal contract, and no one [is] receiv[ing] damages based on a breach of an unenforceable obligation." *Id.*

[58] RESTATEMENT (SECOND) OF CONTRACTS § 266(1).

[59] *Id.* Cmt. a (emphasis added).

[60] *See* Compl. ¶ 46 ("Due to the FAR 17.204 term limitations . . . performance . . . was impossible at the time the Merger Agreement was signed."); Defs.' Opening Br. at 16.

when the Merger Agreement was negotiated. "The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations."[61] Thus, the FAR's effect is precisely the sort of foreseeable event that "could and should have been anticipated by the parties." Obsidian assumed the regulatory risk in negotiating the OPM Earnout and cannot now invoke the doctrine of impossibility/impracticability to avoid the deal to which it agreed.

Separately, even assuming *arguendo* the doctrine of impossibility functioned as Obsidian envisions (it does not), and the FAR regulations are fully incorporated into the contract, they do not *per se* render the OPM Earnout "impossible" to achieve. Contrary to Obsidian's reading, FAR 17.204(e) does not state "the total of all of the contract periods shall not exceed 5 years." Rather, it states, "the total of the basic and option periods shall not exceed 5 years . . . ."[62] The basic and option periods provided for in the Second OPM Contract are expressly delineated and they total 4.5 years.[63] There is then a twelve-month period allocated for "Transition In"

---

[61] *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007), *aff'd*, 985 A.2d 391 (Del. 2009), *as corrected* (Nov. 30, 2009); *see also Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 184 (Del. Ch. 2014) ("Parties have a right to enter into good and bad contracts, the law enforces both." (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010))).

[62] FAR 17.204(e).

[63] Second OPM Contract at 2.

and "Transition Out" activities (6 months each). Under FAR 17.204(e), then, the government could have awarded the Company an extra option period of six months, bringing the total duration of the Second OPM Contract up to six years.

Obsidian's only response to this mathematical reality is that the "Transition In" period is actually either a "base" or an "option" period by another name, which counts toward FAR 17.204(e)'s five-year cap.[64] Obsidian reasons that the FAR makes no mention of a "Transition In" period; thus, despite the fact that the government contract expressly differentiates between "base," "option," and "transition" periods, the transition-in period (but not the transition-out period) counts toward FAR 17.204(e)'s five-year cap.

This argument misses the mark given the government's formulation of FAR 17.204(e) and the Second OPM Contract.[65] Transition-in periods are implicitly contemplated under the FAR, as FAR 52.237–3 (expressly incorporated into the Second OPM Contract) states that a contractor's transition-out period functions as a training period for its successor, in recognition that the party to the contract must "provide sufficient experienced personnel during the phase-in, phase-out period to ensure that the services called for by this contract are maintained at the required level

---

[64] Pl.'s Answering Br. at 9 (citing Compl. ¶¶ 27, 30).

[65] Second OPM Contract at 2–3.

19

of proficiency."[66]   The transition-out period thus coincides with the successor's transition-in period, resulting in a hybrid service model for the purpose of "facilitat[ing] the transition from one contractor to another or to the government. . . . The term 'phase-in, phase-out operations' means activities that assist a new contractor or the government in connection with the transition."[67]  With this in mind, "FAR 52.237–3 contemplates phase-in, phase-out services of a kind different from the usual services performed under the contract."[68]  True to form, the Second OPM Contract contemplates a "Transition In" period, and it expenses both the transition-in and -out periods differently than the base and option periods.[69]

And yet, despite the FAR's clear contemplation of the transition-in period, FAR 17.204(e) states *only* that the "basic" and "option" periods count toward the five-year limitation.  Consistent with the FAR, the Second OPM Contract expressly distinguishes between "base," "option" and transition periods.[70]  Under well-settled canons of construction, "the expression of one thing is the exclusion of another"[71]

---

[66] FAR 52.237–3(b).

[67] *ITT Fed. Servs. Corp. v. Widnall*, 132 F.3d 1448, 1452 (Fed. Cir. 1997).

[68] *Arko Exec. Servs., Inc. v. U.S.*, 553 F.3d 1375, 1381 (Fed. Cir. 2009).

[69] *See* Second OPM Contract at 3.

[70] *Id.* at 2.

[71] *Shintom Co., Ltd. v. Audiovox Corp.*, 888 A.2d 225, 230 (Del. 2005).

and "each word should be given meaning and effect by the court."[72]  These canons counsel that the transition-in period was purposely excluded from FAR 17.204(e), and the Second OPM Contract conformed with the FAR when it distinguished the transition-in period from the base and option periods.  The transition-in period, therefore, does not count toward the five-year limit on basic and option periods.  In other words, the sophisticated Merger parties were not mistaken: the Second OPM Contract could have endured for six years.  Accordingly, the OPM Earnout was not "impossible."

## 2. No Forfeiture or Materiality

Obsidian has also invoked the related concepts of forfeiture and materiality to avoid the clear terms of the Merger Agreement.  Specifically, Obsidian argues that, "since the condition to payment of the OPM Earnout in the wording of the Merger Agreement was impossible to perform, and the impossibility of performance results in a forfeiture of significant consideration for the merger, the Court must determine whether the six-month difference between available performance and impossible performance is material to the merger parties' agreements."[73]

---

[72] *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008).

[73] Pl.'s Answering Br. at 17.

Obsidian again cites to the Restatement (Second) of Contracts for the propositions that "impracticability excuses the non-occurrence of a condition if the occurrence of the condition is not a material part of the agreed exchange and forfeiture would otherwise result,"[74] and, "to the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange."[75] Because materiality is a question of fact, Obsidian reasons, the Court must delay the adjudication of Count I until after fact discovery.

As an initial matter, I have found the OPM Earnout's condition—a six-year government contract—was not impracticable. That finding, alone, is fatal to Obsidian's forfeiture argument.

Separately, Obsidian's argument that the Court may declare immaterial the six-month difference between the 5.5-year contract and the six-year earnout condition is misplaced. Obsidian cites no authority that would support a holding that a party to a merger agreement may be excused from satisfying a condition to an earnout on grounds of forfeiture.[76] This comes as no surprise, as an earnout

---

[74] *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 271).

[75] *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 229); *see also In re Am. Home Mortg. Co.*, 402 B.R. 87, 104 (Bankr. D. Del. 2009) (relying on RESTATEMENT (SECOND) OF CONTRACTS § 229 to avoid forfeiture where the breach was immaterial to the contract).

[76] Obsidian relies principally on two cases, both of which are distinguishable. First, in *Jefferson Chems. Co. v. Mobay Chem. Co.*, the plaintiff forfeited its patent rights after

provision contemplates the payout of additional, often substantial, consideration when the entity sold achieves specific, bargained-for milestones. The value of the contingent consideration is inextricably linked to the estimated probability of the contingent event's occurrence.[77] To change the benchmark of the earnout would be to change its risk profile and, by extension, the amount that should be paid in the event of its achievement. Under Delaware law, however, "a party may not come to

---

voluntarily dismissing a lawsuit in favor of claims pending in another federal court, triggering incidentally a reassignment provision in an agreement between the parties. 267 A.2d 635, 636 (Del. Ch. 1970). The court rejected the defendant's effort to seize on what the court viewed as a "technical mistake" without substantive implications (given the plaintiff continued to pursue the relevant claims) as support for the forfeiture. *Id.* Here, Obsidian's forfeiture claim rests on the remarkable proposition that it may force the payment of significant contingent consideration because the contingency was *almost* satisfied. Earnout targets cannot be shrugged off with a "close enough." More fundamentally, there is no inequitable forfeiture here, where Plaintiff retains nearly 90% of the Merger consideration and now seeks payment of consideration it agreed would be awarded only on the achievement of a contingency. In Plaintiff's second case, *Elwell v. Those Certain Underwriters of Lloyd's, London*, the plaintiffs' home burned down after they purchased a home insurance policy, and the court refused to condone the insurer's justification for its denial of coverage, namely that the plaintiffs failed to comply with the contractual requirement that they keep a fire extinguisher on each floor of their home. 2010 WL 3447570, at *1–2, 6 (Del. Super. Ct. Aug. 27, 2010). Though the "materiality" of a condition precedent requiring a spare fire extinguisher in an attic may raise an issue of fact ill-suited for resolution on a motion to dismiss, an earnout provision is a carefully negotiated provision where the payout is expressly conditioned on the satisfaction of its precise terms.

[77] *See, e.g.*, *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126 (Del. Ch. 2009) (explaining that "[w]hat an earn-out (and particularly a large one) typically reflects is disagreement over the value of the business that is bridged when the seller trades the certainty of less cash at closing for the prospect of more cash over time. In theory, the earn-out solves the disagreement over value by requiring the buyer to pay more only if the business proves that it is worth more.").

court to enforce a contractual right that it did not obtain for itself at the negotiating table."[78] Unlike horseshoes or hand grenades, there is no "close enough" when it comes to earnouts negotiated by sophisticated parties based on the estimated probability that the *precise* measure would be hit. Any adjustment to the earnout condition, then, would be "material" as a matter of law.

*****

Obsidian has offered no sustainable basis to avoid the bargain it struck in clear contractual expressions of intent. Defendants' motion to dismiss Count I, therefore, must be granted.

## B. Plaintiff Fails to State a Viable Claim in Count II

In Count II, Obsidian seeks a declaratory judgment that the Merger Agreement "must be interpreted to mean that the conditions for payment of the [Earnout Provision] are satisfied by multiple renewals of the OPM Contract or replacement contracts for an aggregate period of six years" and, therefore, the Company's "attempted repudiation of its obligations under Section 1.11(a) is void."[79] Under 10 *Del. C.* § 6501, Delaware courts "have [the] power to declare rights, status and other legal relations whether or not the relief is or could be

---

[78] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *7 (Del. Ch. June 21, 2012).

[79] Compl. ¶¶ 56–58.

claimed."[80]    Parties to a contract may seek declaratory relief to determine "any question of construction or validity" and may seek a declaration of "rights, status or other legal relations of thereunder."[81]   Declaratory relief is available where an "actual controversy" exists, *i.e.*, when the terms of a contract or its validity are in dispute.[82]

Obsidian's claim in Count II fails because there is no conflict between the unambiguous terms of the Merger Agreement and the Second OPM Contract.  For reasons explained, the Second OPM Contract could have extended to six years under the FAR.   Under the Merger Agreement, Section 1.11(a)(i) speaks in singular indefinite articles and nouns when it contemplates "*an* extension or renewal of the OPM Contract for *an* additional term of at least six (6) years (or *a* new or replacement contract for *a* term of at least six (6) years)."[83]   This manifests the parties' clear intent that the OPM Earnout would be triggered only if the Company was awarded a single extension of the OPM Contract (or new or replacement contract) of at least six years.

---

[80] 10 *Del. C.* § 6501.

[81] 10 *Del. C.* § 6502.

[82] *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479 (Del. 1989); *E.I. DuPont De Nemours & Co., Inc. v. Huttig Bldg. Prods., Inc.*, 2002 WL 32072447, at *2 (Del. Super. May 28, 2002).

[83] Merger Agreement § 1.11(a)(i) (emphasis added).

Buttressing that construction is the OPM Earnout's structure. Section 1.11(a)(i) contemplates 50% of the OPM Earnout Amount will be paid upon award of an additional term of at least six years.[84] Section 1.11(a)(ii) provides that the remainder of that amount will be due on the eighteen-month anniversary of that date if the qualifying contract remains in "full force and effect."[85] That structure does not fit within Obsidian's proffered framework, as the "Applicable Deferred OPM Earnout Payment Amount" in Section 1.11(a)(ii) would be due in Obsidian's abstraction *before* the time contemplated by Section 1.11(a)(i) expired. Thus, Obsidian's proposed reading of the contract would require a wholesale rewrite of the OPM Earnout.

Obsidian does not explain how the terms allegedly implied through the Second OPM Contract should work to overwrite the unambiguous express terms set forth in the Merger Agreement. "[I]t is not the proper role of a court to rewrite or supply omitted provisions to a written agreement."[86] Because there exists only one way to read the Merger Agreement vis-à-vis the Second OPM Contract, and that

---

[84] *Id.*

[85] *Id.* § 1.11(a)(ii).

[86] *SV Inv. P'rs, LLC v. Thoughtworks, Inc.*, 7 A.3d 973, 992 (Del. Ch. 2010) (quoting *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998)).

reading provides that the OPM Earnout's six-year trigger applied only to a single renewal, Defendants' motion to dismiss Count II must be granted.

**C. Plaintiff Fails to State a Viable Claim in Count III**

In Count III, Obsidian seeks to reform the Merger Agreement because the OPM Earnout's requirement of a single extension or a new contract for a term of six years is "based upon a mutual mistake of fact and law by the Merger Parties and does not, therefore, reflect the true intent of the Merger Parties with respect to the conditions required for payment of the OPM Earnout Amount."[87] "Reformation is an equitable remedy which emanates from the maxim that equity treats that as done which ought to have been done."[88] Reformation does not, however, provide the Court "equitable license . . . to write a new contract at the invitation of a party who is unsatisfied with his or her side of the bargain; rather, it permits the Court to reform a written contract that was intended to memorialize, but fails to comport with, the parties' prior agreement."[89]

---

[87] Compl. ¶ 60.

[88] *Interim Healthcare, Inc. v. Sherion Corp.*, 2003 WL 22902879, at *6 (Del. Ch. Nov. 19, 2002, revised Dec. 1, 2003) (quoting 27 WILLISTON ON CONTRACTS § 70:19 (4th ed. 2003)).

[89] *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at *13 (Del. Ch. Oct. 20, 2015).

To justify reformation of a contract under Delaware law, a plaintiff must plead three elements:

> (1) that party was mistaken about the contents of the final, written agreement; (2) that either its counterparty was similarly mistaken or that the counterparty knew of the mistake but remained silent so as to take advantage of the error; and (3) that there was a specific meeting of the minds regarding a term that was not accurately reflected in the final written agreement.[90]

A reformation claim is subject to Chancery Rule 9(b) and so must state "with particularity" the "circumstances constituting . . . mistake."[91] To plead cognizable mistake, our Supreme Court has made clear that a plaintiff must plead with particularity "that the parties came to a specific prior understanding that differed materially from the written agreement."[92]

Obsidian alleges no such particularized facts. Rather, Obsidian fixes its theory of reformation on the parties' mistaken belief that a single six-year extension

---

[90] *In re 11 W. P'rs, LLC*, 2019 WL 1300859, at *5 (Del. Ch. Mar. 20, 2019) (internal citation omitted).

[91] Ct. Ch. R. 9(b); *see also Gracelawn Mem'l Park, Inc. v. Eastern Mem'l Consultants, Inc.*, 291 A.2d 276 (Del. 1972); *TIBCO*, 2015 WL 6155894, at *12–13 (explaining "[i]n the context of a reformation claim, Rule 9(b) requires that 'the facts upon which a plaintiff relies in pleading reformation must be set forth with at least some particularity in order to put the defendant on notice of what is charged against him" and that, to survive dismissal of a reformation claim, the plaintiff must "allege particularized facts concerning the circumstances of a mutual mistake from which it is reasonably conceivable that plaintiff would be able to establish each of these elements by clear and convincing evidence." (internal citation omitted)).

[92] *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1152 (Del. 2002).

could be achieved under federal regulations.[93]  "Had the Merger Parties known and understood the effect of FAR 17.204 and FAR 52.217–8 on the potential duration of an extension or a new contract," Obsidian alleges, "the Merger Parties would have drafted Section 1.11(a)(i) so that the OPM Earnout Amount would be owed if the OPM Contract was extended for six years by one or more extensions or one or more new contracts between the Company and United States Government."[94]  But Obsidian's Complaint is bereft of particularized facts detailing a "specific prior understanding" as to the terms it seeks to reform.  For that reason, Obsidian's reformation claim fails as a matter of law.

Moreover, for reasons explained, the Second OPM Contract could have extended over six years.  Thus, not only does Obsidian fail to allege a prior understanding that differs from the Merger Agreement, it also fails to allege a contemporaneous *mis*understanding. This failure separately requires dismissal of Count III.

---

[93] Compl. ¶¶ 66–69.

[94] Compl. ¶ 67.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Complaint in its entirety is GRANTED.

**IT IS SO ORDERED.**